Filed 5/8/26  P. v. Ibarra CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO IBARRA,<br><br>Defendant and Appellant. | B337097<br><br>(Los Angeles County<br>Super. Ct. No. GA106571) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Darrell Mavis, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant and appellant Antonio Ibarra of sexual penetration by force and kidnapping. On appeal, Ibarra contends the evidence was insufficient to identify him as the perpetrator of the crime. He further argues the court erred in failing to clarify the burdens of proof in its response to a jury question and in failing to sua sponte instruct the jury on false imprisonment as a lesser included offense of kidnapping. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2020, the People filed an information charging Ibarra with two counts of sexual penetration by force (Pen. Code, § 289, subd. (a)(1)(A);[1] counts 1 & 2) and one count of kidnapping with the intent to commit a violation of section 289 (§ 209, subd. (b)(1); count 3), as well as several enhancements and special allegations.[2] In November 2023, the case was tried to a jury.

### The People's Evidence

#### A.    Jeanette K.

In July 2018, Jeanette K. lived in a house in Pasadena that shared a driveway, parking area, and laundry room with an adjacent fourplex apartment building. The laundry room was behind the carport at the back of the property. It was accessible through a narrow walkway between the back of Jeanette's house and the carport. The laundry room locked from the outside. The lock was "difficult to close." The rear of the property was

_____

[1]    All further undesignated statutory references are to the Penal Code.

[2]    The court ultimately dismissed count 2 and the related enhancements pursuant to section 1385.

2

enclosed by a fence and a wall separating it from the neighboring property.

On July 15, 2018, Jeanette was doing laundry at 2:30 a.m. Because the motion detector lights outside the laundry room were not working, it was "pitch dark." She was standing in front of the laundry room when she noticed a man at the end of the walkway just beyond her parked car. At trial, Jeanette testified that the man was six feet to six feet, two inches tall and somewhere between 180 and 200 pounds. She did not recognize him.

Jeanette asked the man who he was. The man turned around and asked her who she was. Jeanette told him she lived there and was doing laundry. The man said he " 'live[d] here in the front apartments' " and was also doing laundry. She told the man she had a lot of laundry left to do, so he would be waiting a while. He said that was okay, and he had time.

Jeanette decided to try to pass the man on the walkway and return to her house. As she moved forward, the man also walked forward toward her and the laundry room door. They eventually "came face to face" by the laundry room door. The man was twisting a piece of cloth in his hands. Jeanette noticed that he had a "big" and "very flamboyant" letter "A" in "old-fashioned writing" tattooed on his right hand. There was other writing on that hand, but the "A" "was much larger than the rest of the writing." It extended from his index finger to his wrist and "took up . . . the upper part of the hand."

As Jeanette turned away from the man, he put the cloth around her neck from behind. He began "smashing" her face by hitting her repeatedly with his open, bare hand and his closed fist, "mostly on the right side" of her face. The man forced Jeanette back into the laundry room.

Jeanette ended up on the floor of the laundry room, where the man continued to kick and hit her. He then removed her clothes and digitally penetrated her vagina. The man told Jeanette to " 'shut up' " when she tried to make a noise or scream. Before he left, he told her not to follow him for " 'at least five minutes' " or he would " 'come back and shoot [her].' "

After the man left, Jeanette could not open the door because it had been locked from the outside. She managed to exit through a window, then ran to her house and called the police.

The People played the 911 call for the jury. In the call, Jeanette said she was "suspicious about [her] neighbor" because he "left in his car a little after two" and returned 10 minutes later. Jeanette described the attacker as a young Black man who had "a lot of cream in his coffee." She said his hair was "flat shaven, it wasn't bald, not an afro but it was shaven down." She recalled that he had tattoos on his forearms and hands in "fancy writing" and she believed he had tattoos on his neck. Jeanette said she had never seen the man before. She thought he was wearing a red shirt. She estimated that it had been about 20 minutes since he left. After the call, she drew a picture of the man's letter "A" tattoo on a Post-It note.

Jeanette later spoke to Detective Derek Locklin at the scene. Locklin's body-worn camera recorded the conversation. In the recording, Jeanette said the man who attacked her was "between 6 and 6'2," "closer to 220" pounds, and had "[v]ery light black skin," lighter than Locklin's, and his hair was "cropped" like Locklin's. The only distinct features she identified were the tattoos on his hands. She said the man had an "A" tattooed somewhere on his right hand, "not even" an inch in size, with "smaller writing" and letters "scattered around" the tattoo. She

4

described the "A" as "very fancy." She thought she also saw tattoos on his neck, but her attention was mainly on his hands.

At trial, the prosecutor asked Ibarra to show Jeanette his tattoos. Jeanette recognized the tattoos on Ibarra's hands as the tattoos of the man who attacked her. However, she found it "[v]ery difficult" to identify Ibarra at trial as the person who attacked her. She did not "recognize him as he looked that night." Jeanette testified that she did not get "a very good look" at her attacker's face on the night of the incident.

On cross-examination, Jeanette was unable to explain why, when Locklin showed her a photograph of Ibarra's hand tattoo in 2018, she said it did not match her attacker's tattoo. She also admitted that none of the photographs in the six-pack photographic lineups Locklin showed her, including Ibarra's, "look[ed] familiar to [her] now or then." She testified that her "initial" impression that night, "with no lighting, poor visibility," was that the attacker was of "Black heritage." She confirmed that, at the time, she had told Locklin that she saw her attacker's face very clearly.

Defense counsel asked Jeanette if she remembered describing her attacker's hair as being similar to Locklin's, who is Black. Counsel showed Jeanette a photo of Locklin. Jeanette testified that the photo was of "the white detective" and she did not recognize the person in the photo as Locklin. She testified that the photo did not look like Locklin to her because "he looks like he's got white hair and a white beard." Jeannette testified that she did not see the man who attacked her again at the apartment complex before she moved out at the end of 2018 or

5

beginning of 2019. She confirmed that she had not been able to positively identify the face of her attacker since the incident.[3]

### B.    Law enforcement investigation witnesses

### 1.    Sergeant Matt Crawford

Pasadena Police Department Sergeant Matt Crawford investigated the assault. In July 2018, Crawford and Detective Locklin showed Jeanette a six-pack photographic line-up that did not contain Ibarra's photograph. She was unable to identify anyone as the attacker.

Crawford and Locklin met with Jeanette again in September 2018. Locklin's body-worn camera recorded the interview. In the recording, Crawford and Locklin showed Jeanette another six-pack photographic line-up. Locklin told her to "keep an open mind" knowing it had been very dark, but Jeanette responded that she "saw his face very clearly." Jeanette said none of the men in the six-pack photos, including Ibarra, looked like the man who attacked her because they looked Hispanic and not Black. She said the attacker had broader features and different hair. Locklin showed her photographs of tattoos. She did not recognize any of them. When shown a photograph of Ibarra's right hand, Jeanette said the "A" tattoo was "similar to what [she] saw" on her attacker's hand but not exactly the same.

### 2.    Matthew Sanders

Matthew Sanders is Ibarra's wife's brother. He lived in the fourplex that shared the laundry room, parking area, and

---

[3]    Jeanette sustained an orbital fracture from a fall in 2021, and subsequently suffered migraines, headaches, and "neurological issues." She testified that her memory was better in 2018 than it was at the time of trial.

driveway with Jeanette's house. Ibarra and his family lived with Sanders's parents. Ibarra frequently visited Sanders's home, including most Saturdays. Sanders "sometimes" saw Jeanette outside when Ibarra and his family were over.

Sanders testified that Ibarra and Sanders's father came over to his apartment the evening of July 14, 2018, to watch a UFC fight. His father left at 7:00 p.m. Sanders and Ibarra drank and smoked cigarettes on Sanders's porch that evening. Ibarra left around 12:30 or 1:00 in the morning. Sanders testified that he called Ibarra around 3:20 a.m. "to make sure that he was home safe because I didn't want anything to get pinned on something, what is happening now . . . ."

The police showed up at Sanders's apartment later that night and asked questions about the night before. Sanders told them Ibarra had been at his place and that Pamela, Ibarra's wife and Sanders's sister, had picked Ibarra up at 12:30 a.m. However, Sanders told Locklin the next day that Ibarra left at 1:15 or 1:30 am. Sanders testified that he did not actually see Ibarra get into a car. He saw Ibarra "walk to [a] vehicle" with its taillights on and heard a door close. He had assumed Pamela picked up Ibarra.

Sanders believed it took 10 minutes to drive and 35 to 40 minutes to walk from his home to Ibarra's home. When defense counsel showed him a map, Sanders agreed that walking took "more like 45 minutes."

Ibarra continued to visit Sanders at his apartment after the incident on July 15, 2018.

### 3. DNA evidence

Jeanette received a sexual assault medical forensic exam on the day of the incident. A nurse collected swabs of Jeanette's

7

eye, neck, and genital area. She took swabs of Jeanette's right eye because Jeanette reported that the perpetrator hit her there with his bare fist. A forensic specialist collected a white tank top from the floor of the laundry room and swabbed areas of the room for DNA, including the door hasp and lock. The specialist also swabbed the doorknob and the bottom, neck, and armpit areas of the tank top.

Susannah Knetchel, senior criminalist with the Los Angeles County Sheriff's Department, analyzed the swabs taken from Jeanette. Samples from Jeanette's neck and eye generated a DNA profile that was consistent with a male contributor. Knetchel received reference samples from Jeanette and Ibarra to compare to the DNA profile. The swab from Jeanette's right eye and neck showed two people, Jeanette and Ibarra, contributed to the mixture. Knetchel determined that it was 75,469 times more likely that the DNA from the eye swab was a mixture of DNA from Jeanette and Ibarra than from Jeanette and an unknown person. Similarly, her analysis of the neck swab revealed that it was "[two] times 10 to the 14 times more likely" to be a mixture of Jeanette and Ibarra's DNA than that of Jeanette and an unknown person. Knetchel testified that the remaining sample swabs from Jeanette's vulva, hymen, and fingernail scrapings revealed male DNA was present, but there was too little DNA to create a genetic profile.

Knetchel also analyzed a sample from the lock and door hasp of the laundry room. She testified that the DNA profile from that sample was consistent with three contributors: Jeanette, Ibarra, and an unknown third person. Ibarra was a "four percent contributor" to the DNA mixture found in the sample swab from Jeanette's neck. Testing results showed it was

2,475 times more likely that the DNA "originated from Antonio Ibarra and two unknown individuals than if it originated from three unknown individuals."

Criminalist Michelle Metchikian tested a swab sample taken from the neck of the white tank top. She determined two people contributed to the DNA mixture, one male and one female. Metchikian compared the male DNA profile to Ibarra's reference sample. Applying different assumptions to the swab sample, she determined that the possibility that someone other than Ibarra was the source of the DNA on the swab was 1 in 18 quadrillion or 1 in 82 septillion.

Knetchel confirmed that "every time we touch something, we transfer DNA," and "every time our things touch something, it transfers DNA." She testified that clothing could transfer the DNA of one person who wore it to another person who touches it. She further explained that a person's DNA can indirectly transfer to other surfaces. For example, if she and counsel shook hands, her DNA would transfer to counsel's hands and could subsequently be transferred to another surface that counsel touched afterward. She confirmed that if Ibarra's DNA "was on a shirt and that shirt touched another surface, his DNA could transfer to that other surface."

Metchikian similarly testified that DNA could be transferred from one surface to another by an intermediary, such as a person or object. She explained that it was easier to deposit DNA on a porous surface than on a smooth surface, but harder for an intermediary to "pick up" DNA left on a porous surface like a piece of clothing because the DNA "would get stuck" in the fibers of the fabric. She also testified that the more friction applied between two surfaces, the more likely it is that DNA will

be left behind. She agreed with the prosecutor's statement that "repeatedly punching something with [a] hand," would create an opportunity to transfer DNA.

*Defense Evidence*

### A. Pamela Ibarra

Ibarra's wife Pamela testified that she and Ibarra often visited Sanders at his apartment and continued to do so in the months after Jeanette was attacked. She and Ibarra usually exchanged greetings with Jeanette when they saw her.

On July 14, 2018, Ibarra went to Sanders's house around 6:30 p.m. and returned home at 2:30 a.m. Pamela was awake in the living room with her children when he came home. Ibarra was alone. Pamela did not see any blood, scratches, or bruising on him. As Pamela recounted to police, later that morning, Sanders called her and told her about the assault on Jeanette. Sanders said police "were looking for a Black man with tattoos on his hands." After learning this information, Pamela slapped Ibarra and asked, " 'What happened?' " Pamela testified that she slapped him "because he should have been home with me."[4]

On cross-examination, Pamela admitted that Ibarra returned home around 3:30 a.m. on July 15, 2018. She indicated that she had previously testified from memory, but reviewing

---

[4] On recross, Pamela testified that she did not remember saying that she slapped Ibarra. The prosecutor played audio from Pamela's recorded interview with police to impeach her. In the excerpt, she told police that when she learned about the attack, she "slapped the shit out of [her] husband and said 'what happened?' " Pamela confirmed the transcript of the recording was accurate, but denied that she slapped Ibarra, claiming "it was a tap." She further testified that Ibarra responded that he did not know what happened.

10

phone records refreshed her recollection that Ibarra called her at 3:34 a.m. Ibarra had called her as he was coming up the stairs and asked her to open the door. However, she had originally told police that she did not know what time Ibarra came home because she went to sleep at 12:30 a.m. She also told police that Ibarra had not called her that night.

In a recorded conversation with Locklin and Crawford in September 2019, Pamela said she was not sure how Ibarra got home the morning of July 15, 2018. She did not recall getting a phone call from him, but she had been texting him to come home. She estimated that Ibarra got home "around 11:30, maybe 12." She did not know if Ibarra and her father arrived home together.

In July 2018, Ibarra weighed "160 something" because he was sick. She described him as "slim."

### B. Defense DNA expert

Mehul Anjaria is an independent forensic DNA consultant. He reviewed the DNA analysis performed on the swab samples and advised the defense about the strengths and weaknesses of the testing. He did not disagree with the prosecution analysts' results and conclusions.

Defense counsel asked Anjaria what he would test to determine whether an individual who handled a white tank top by "holding the sides of it" and wringing it between his hands had left DNA on the surface. Anjaria responded that he would want "to look at the ends of the tank top where there would have been contact with the hands . . . ." Defense counsel asked if Ibarra's DNA might be present on Jeanette's eye and neck if a third person took a tank top Ibarra had worn and wrapped it around Jeanette's neck. Anjaria opined that "there could be a transfer of DNA from the tank top to [Jeanette's] skin wherever the tank top

11

may have touched it." Anjaria also testified that Ibarra did not have to touch the door hasp and lock for his DNA to be found there. A third person holding Ibarra's tank top could have transferred Ibarra's DNA from the tank top to the lock and hasp with his hand.

### C.    Ibarra

Ibarra testified in his own defense. He is 5 feet 11 inches tall. He weighed about 166 pounds in 2018. At the time of trial, he weighed 260 pounds. In 2018, his shoulder was injured. He was unable to pick up, wrestle, slap, or punch anyone.

Ibarra has tattoos on his arms and hands. His son's name begins with the letter "A" and is tattooed on his right hand. The tattoo is about four inches long and two inches wide.

In 2018, Ibarra visited Sanders's apartment every other weekend. If Ibarra saw Jeanette when he visited, they greeted each other. Although Sanders complained to Ibarra about Jeanette, Ibarra denied having any problems with her.[5]

On July 14, 2018, Ibarra and his father-in-law went to Sanders's apartment in the evening to watch a UFC fight. They smoked cigarettes outside. Ibarra was wearing a new white, blue, and black checkered shirt. He took off the shirt because it was hot, so that he was wearing only his white tank top. After the beer Ibarra was opening "exploded," he took off the tank top and hung it on a wooden fence to dry. He put his new shirt back on. Jeanette came by and said: " 'Hey, you guys are smoking

---

[5]    Ibarra did not elaborate on the problems Sanders had with Jeanette. Jeanette, however, testified that Sanders was a "challenging" neighbor because he often invited people over to party and barbecue outside.

12

those nasty cigarettes.' " The men put out the cigarettes and went back inside.

Ibarra testified that his friend Danny Pacheco picked him up from Sanders's apartment somewhere between 1:00 and 1:30 a.m. the following morning. Pacheco was a close family friend who lived in Altadena. Ibarra had been texting Pacheco that night since about midnight. Ibarra testified that reviewing phone records and recognizing Pacheco's phone number helped him remember that Pacheco picked him up that morning.

Ibarra's phone records reflected a list of his incoming and outgoing calls for July 14 and 15, 2018. Ibarra recognized Pacheco's phone number in the records. There were several calls between Ibarra and Pacheco starting at 11:00 p.m. on July 14, 2018, with the last contact at 11:50 p.m.

Ibarra testified that Pacheco called him around 1:15 a.m. to let Ibarra know that he was outside.[6] Ibarra left Sanders's apartment and got in Pacheco's Jeep. He and Pacheco went to a bar Ibarra often frequented after going to Sanders's apartment. Ibarra and Pacheco then went to get tacos, which Ibarra estimated took about 30 minutes. Pacheco later dropped Ibarra off at home. Ibarra called Pamela when he got home because he forgot his keys.

Ibarra recalled Sanders calling him later that day to tell him that someone had assaulted Jeanette. He also testified that Pamela slapped him and asked him what happened. Pamela often slapped him when he went to bars and came home late because she was worried, and because when he was out late, she thought he was "with other girls." Ibarra continued to visit Sanders's home every other weekend. He and Jeanette continued

---

[6] No such call was reflected in Ibarra's cell phone records.

to exchange pleasantries when they saw each other.  He denied ever attacking Jeanette.

In September 2019, Locklin and Crawford conducted a recorded interview of Ibarra.  They asked Ibarra about his whereabouts on the night of July 14, 2018, and the early morning hours of July 15, 2018.  The officers pointed out that Ibarra's account of his movements was inconsistent with the locations of calls he made and received on his cell phone that night.  For example, Ibarra initially said he and his father-in-law left Sanders's apartment at 10:30 p.m.  But his cell phone records reflected that he made an outgoing call at 1:24 a.m. from Sanders's neighborhood.  Ibarra then claimed he had called Pamela at that time to ask her to open the door when he got home, after which he had "a couple of beers" with his father-in-law.  However, phone records showed a call Ibarra received from Sanders at 3:20 a.m. indicated he was still not home at that time, and further showed that Ibarra did not call Pamela that morning until 3:34 a.m.  Ibarra explained that he and his father-in-law took an Uber home and stopped to get something to eat on the way.

After the police interview, Ibarra called his wife from jail.  The call was recorded.  Ibarra told Pamela that he had spilled beer on his shirt, took it off, and put it on the gate across from Sanders's apartment.  He continued: "I said probably anybody grabbed it then choked her out with my shirt. You know.  My muscle shirt.  You know?"  Pamela responded: "Don't say nothing else.  That's just stupid."  On cross-examination, the prosecutor asked how Ibarra knew the tank top was used to choke Jeanette.

14

Ibarra testified that Locklin told him before he started recording the interview that someone used the tank top to choke Jeanette.[7]

When asked on cross-examination why his story to police changed over the course of the interview, Ibarra testified that he did not remember details in 2019, and he thought at the time that Locklin was asking him about different visits to Sanders's apartment.  Ibarra admitted that his trial testimony was the first time he had ever mentioned Pacheco picking him up on July 15, 2018.  Ibarra testified that he did not mention Pacheco to police because he did not remember that Pacheco picked him up until he saw his phone records.  When asked why he "never thought . . . to contact [his] alibi witness . . . and tell somebody about him," Ibarra said, "No, because I was waiting for trial because I don't want to take no time."

### D.    Sergeant Crawford

Crawford testified that based on Jeanette's 911 call, he believed the attack on Jeanette happened at approximately 2:45 a.m. to 2:50 a.m.  He obtained Ibarra's cell phone records.  He explained that they showed that Ibarra's phone communicated with the cell tower providing coverage to Jeanette's home at 1:24 a.m.; communicated with a different cell tower in an adjacent sector between Jeanette's home and Ibarra's home at 3:20 a.m.; and communicated with the cell tower

---

[7]    Crawford subsequently testified that Locklin's body worn camera recorded their entire encounter with Ibarra, from the moment they met Ibarra at the station to the point when Locklin escorted him to jail after the interview.  He further testified that during the interview, he and Locklin intentionally omitted anything about choking, strangulation, or Jeanette's neck, although they did indicate the tank top was used to drag Jeanette into the laundry room.

15

providing coverage to Ibarra's residence at 3:34 a.m. The data indicated Ibarra was "moving." Based on the records, Crawford believed Ibarra walked home from the scene between 2:50 a.m. and 3:34 a.m.

Crawford testified that another detective recovered surveillance footage of an individual walking in the area. The person in the surveillance footage was wearing a red shirt and was heading west, away from the intersection, at approximately 2:51 am. Although "it was not of great quality," Crawford believed "it was possibly Mr. Ibarra."

### Verdict and Sentence

The jury convicted Ibarra of sexual penetration by force (count 1) and aggravated kidnapping (count 3). It also found the great bodily injury and weapon enhancements true as to both counts. As to count 1, the jury also found true the allegations that Ibarra kidnapped the victim (§ 667.61, subds. (a), (d)(2), (e)(1)); the movement substantially increased the risk of harm over that necessarily inherent in the underlying event (*id.*, subds. (a), (d)(2)); the offense was committed during the commission of a burglary (*id.*, subds. (a), (e)(2)); and Ibarra engaged in tying or binding the victim (*id.*, subds. (a), (e)(5)).

The trial court sentenced Ibarra to a total term of 29 years to life. The sentence consisted of an indeterminate term of 25 years to life on count 1, pursuant to the One Strike law (§ 667.61, subd. (a)); a consecutive determinate term of three years for the great bodily injury enhancement (§ 12022.7, subd. (a)); and a consecutive one-year term for the weapons enhancement (§ 12022, subd. (b)(1)). The court stayed the sentence on count 3 pursuant to section 654.

Ibarra timely appealed.

16

**DISCUSSION**

## I. Sufficiency of the Evidence

### A. Standard of review

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Powell* (2018) 5 Cal.5th 921, 944.) "[W]e determine ' "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.] Under such standard, we review the facts adduced at trial in the light most favorable to the judgment, drawing all inferences in support of the judgment to determine whether there is substantial direct or circumstantial evidence the defendant committed the charged crime." (*People v. Misa* (2006) 140 Cal.App.4th 837, 842.)

" 'If the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' [Citation.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 963.)

### B. Discussion

Ibarra contends that the evidence was insufficient to prove

beyond a reasonable doubt that he was Jeanette's attacker.  We disagree.

### 1.    Substantial evidence supported the jury's conclusion that Ibarra was the perpetrator

Substantial circumstantial evidence connected Ibarra to the crime and proved his guilt beyond a reasonable doubt. (*People v. Bean* (1988) 46 Cal.3d 919, 932–933.)  It is undisputed that Ibarra was visiting Sanders the night of the attack. Evidence supported the conclusion that Ibarra was present at the time police believed the assault occurred between 2:45 and 2:50 a.m.  Phone records indicate Ibarra was in the same coverage area as Jeanette's house at 1:24 a.m. and that he was in an area between her house and his residence half an hour after the assault.

Although Jeanette was unable to identify Ibarra's face, she described a distinctive tattoo on her attacker's hand which generally matched the tattoo on Ibarra's hand.  She told police in 2018 that the letter "A" tattooed on Ibarra's right hand looked similar to the tattoo she had noticed on her attacker's hand.  She subsequently testified at trial that she recognized Ibarra's tattoo as her attacker's.

Ibarra's DNA was the only male DNA found on Jeanette's right eye, where Jeanette testified her attacker hit her repeatedly with a bare hand.  Jeanette testified that her attacker locked her in the laundry room after the assault, and Ibarra's DNA was found on the laundry room's door lock and hasp.  Ibarra knew the tank top was used to choke Jeanette, even though the police had not disclosed that fact to him.

18

Ibarra argues that the presence of his DNA at the scene, without evidence of when or how it got there, was insufficient to connect him to the assault beyond a reasonable doubt. To support the argument, he relies on authorities holding that, in certain circumstances, fingerprints found on movable objects at the crime scene were insufficient to establish the defendant's guilt. However, the cited cases are distinguishable from the case at bar.

For example, in *Mikes v. Borg* (9th Cir. 1991) 947 F.2d 353, the prosecution relied exclusively on the defendant's fingerprints found at the murder scene on chrome posts—which were "portions of a disassembled turnstile unit"—as evidence of his guilt. (*Id*. at p. 355; see *id*. at pp. 355–356.) Because the posts were previously accessible to the public, including the defendant, when they operated as turnstiles and when they were offered for sale at a hardware store, the Ninth Circuit concluded there was insufficient evidence for a jury to conclude beyond a reasonable doubt "that the defendant touched the object *during the commission of the crime*." (*Id*. at p. 361; see *id*. at p. 358.) The prosecution in the other cases Ibarra cites similarly relied heavily on fingerprints on movable objects without establishing that those objects were inaccessible to the defendants before the commission of the crime. (*Birt v. Superior Court* (1973) 34 Cal.App.3d 934, 938 [fingerprints on lighter found in "rental vehicle available to the public"]; *Borum v. U.S.* (D.C. Cir. 1967) 380 F.2d 595, 597 [fingerprints on jars with no evidence of when or where jars purchased]; *State v. Payne* (1982) 186 Conn. 179, 183, fn. 3 [fingerprints outside of window of victim's car, which had been accessible to public and in areas defendant frequented].)

In the above cases, the prosecution relied on fingerprints that were found on objects accessible to the defendants as members of the general public before the commission of the crimes.  In contrast, here, Ibarra's DNA was not only found on an item to which he had legitimate access before the crime.  It was also on the victim's body and on the door hasp and lock of the laundry room of an apartment complex where Ibarra did not live. In cases where fingerprints are found in similarly unique and highly incriminating places, courts have concluded they are sufficient to support guilty verdicts.  (See, e.g., *People v. Johnson* (2019) 8 Cal.5th 475, 516 [fingerprint found on magazine clip for handgun used in crime supported conviction because no evidence it was accessible to general public]; *People v. Corral* (1964) 224 Cal.App.2d 300, 305 [fingerprint on clasp of purse from where money was stolen while at home]; *People v. Rodis* (1956) 145 Cal.App.2d 44, 46–47 [fingerprint on outside of window from shop that was burglarized that was nine feet off the ground protected by screen].)

Additionally, other evidence permitted the inference that Ibarra's DNA was found on Jeanette and at the scene because he was the perpetrator of the attack.  This was not a "DNA only" case comparable to the fingerprint cases on which Ibarra relies. (Cf. *U.S. v. Talbert* (9th Cir. 1983) 710 F.2d 528, 531 [not a " 'fingerprints only' " case where defendant knew victim, knew he had money, " 'joke[d]' " that he would retaliate, and alibi defense did not account for whereabouts at time of murder].)  Thus, Ibarra's cited authorities do not support his contention that the DNA evidence in this case was not sufficiently probative for a jury to infer guilt.

Ibarra contends the evidence supported the conclusion that his DNA was found at the scene of the crime because a third party used and handled his tank top, and not because he was involved. Yet, the jury was not required to accept this theory. The People's experts testified that while it is possible for someone to transfer DNA from one surface to another, it is harder for an intermediary—in this case, an unknown perpetrator—to "pick up" DNA from a porous surface, like clothing. Moreover, the People's expert testified that it was more likely that DNA would be transferred when friction is applied between two surfaces, such as when someone repeatedly strikes someone else with a bare hand. It was undisputed that Jeanette and Ibarra were the only contributors of the DNA found in areas of Jeanette's face and neck, including her eye, where she testified that she was hit with a bare hand. The jury could reasonably conclude that the presence of Ibarra's DNA on Jeanette and on the hasp and lock of the laundry room demonstrated his direct contact with these surfaces, and was not due to secondary transfer from the tank top.[8]

The evidence that Ibarra was in Jeanette's complex the evening before; that he was in the area at the time of the assault; that he had a similar tattoo as the attacker; and that his DNA was found on Jeanette and at the scene of the crime; was

---

[8]    As to Ibarra's contention that none of his DNA was found on other swabs from Jeanette's body, this mischaracterizes the evidence. The testing did not conclusively exclude Ibarra as a contributor to those samples but instead found too little male genetic material to generate a DNA profile for more specific identification.

reasonable, credible, and of solid value, and sufficiently supported the jury's identification of him as the perpetrator.

> **2. Jeanette's non-matching description of her attacker, the lack of an eyewitness identification, and conflicts in the evidence do not demonstrate a lack of substantial evidence to support the verdict**

Ibarra contends the evidence was insufficient to support the jury's findings because no rational juror could have concluded beyond a reasonable doubt that he was the perpetrator, given the discrepancies between Jeanette's description of her attacker in 2018 and Ibarra's physical appearance; Jeanette's failure to identify him as her attacker from the six-pack photographic line-up or from his tattoos; and other evidence from which the jury could infer Ibarra was not the perpetrator. We disagree.

"[T]o entitle a reviewing court to set aside a jury's finding of guilt the evidence of identity must be so weak as to constitute practically no evidence at all. [Citations.] The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, the uncertainty of recollection, and the qualification of identity and lack of positiveness in testimony are matters which go to the weight of the evidence and the credibility of the witnesses, and are for the observation and consideration, and directed solely to the attention of the jury . . . ." (*People v. Lindsay* (1964) 227 Cal.App.2d 482, 493–494; *People v. Mohamed* (2011) 201 Cal.App.4th 515, 522.) "[T]he evidence identifying an accused as the perpetrator of the crime charged need not be positive and

22

uncontradicted." (*People v. Arenas* (1954) 128 Cal.App.2d 594, 601.)

Further, "[e]ven where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ' " 'be reasonably reconciled with the defendant's innocence.' " ' [Citation.]" (*People v. Gomez* (2018) 6 Cal.5th 243, 278.)

That Jeanette did not affirmatively identify Ibarra as her attacker does not mean, as Ibarra suggests, that the jury resorted to speculative inferences to conclude Ibarra was the perpetrator. As explained above, other evidence—including phone records, DNA, Ibarra's tattoo of the letter "A" on his right hand, and Jeanette's comment that the tattoo was "similar" to her attacker's in 2018 and her subsequent identification of the tattoo at trial— supported the jury's identification of Ibarra as the perpetrator.

Likewise, the jury could rationally have concluded the evidence established beyond a reasonable doubt that Ibarra was the perpetrator, even though he did not match Jeanette's description of her attacker. There was evidence that Jeanette did not, in fact, have an opportunity to get a good look at her attacker's face. She had difficulty identifying even a detective from a photo. In addition, her testimony about Black and Hispanic "features" suggested that her perception of racial and ethnic identity was unreliable. The jury could reasonably discredit Jeanette's description of her attacker, while still relying on the other circumstantial evidence of Ibarra's guilt.

We further disagree that Ibarra's alibi testimony or other evidence from which the jury could have inferred Ibarra's innocence, such as surveillance video, Sanders's testimony, or the

cell phone records, fatally undermines the jury's findings. Ibarra's shifting narrative about how he left Sanders's apartment and his whereabouts at the time of the assault permitted the inference that his testimony at trial was not true. (*People v. Zgurski* (2021) 73 Cal.App.5th 250, 267 ["material change" in defendant's story "is evidence from which the jury could have concluded that [defendant's] trial testimony was untrue"].) The jury was entitled to discredit his alternate version of events. We do "not substitute the jury's implied findings with an alternate version, preferred by defendant, that the jury considered and rejected." (*People v. Manriquez* (2005) 37 Cal.4th 547, 578.) With respect to the inferences the jury could have drawn from surveillance video or the cell phone records, "[i]t is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown* (1984) 150 Cal.App.3d 968, 970.)

In sum, the record contains substantial evidence that Ibarra was the perpetrator, including the DNA evidence found at the scene and on Jeanette's person. The jury's verdict is supported by substantial evidence.

## II. The Trial Court's Response to the Jury's Question Was Not an Abuse of Discretion

Ibarra contends that the trial court abused its discretion by failing to clarify the burdens of proof in response to the jury's question during deliberations.[9] We find no error.

---

[9] Although Ibarra's trial counsel did not raise this issue below, Ibarra contends the argument remains cognizable on appeal because the trial court's error affected his substantial rights. (§ 1259.) He alternatively argues his counsel was

24

## A. Relevant background

During cross-examination, Knetchel, the criminalist who analyzed the swab samples, testified that her laboratory did not perform Y-STR testing, a type of DNA testing that can generate a DNA profile for male chromosomes found in a DNA sample. No Y-STR testing was performed on the samples from Jeanette's nail scrapings or genitalia. On redirect, Knetchel confirmed there were no rules prohibiting the defense from testing the swab samples she had analyzed from the crime scene. The defense expert Anjaria testified that Y-STR testing may have provided information about the male contributor to two of the swabs taken from Jeanette's genitalia and the fingernail scraping swabs. However, on cross-examination he confirmed that he did not advise the defense to have the remaining six swabs tested for DNA or to have any swab samples undergo Y-STR testing.

In the defense closing argument, counsel argued that the DNA evidence was insufficient to prove Ibarra's guilt because no Y-STR testing was performed on the DNA samples from Jeanette's fingernails and genitalia. Counsel also argued that Ibarra's alibi involving Danny Pacheco was true and confirmed his innocence.

In her rebuttal closing argument, the prosecutor suggested the defense could have tested the remaining swabs and could have done Y-STR testing. She argued that the defense did not conduct the testing because it would have created more evidence against Ibarra. As to Pacheco, the prosecutor argued: "So then

_____

ineffective for failing to object. We agree that Ibarra's due process argument is not forfeited by trial counsel's failure to object, and we need not address his ineffective assistance of counsel claim.

25

last week for the first time we hear about Danny. The defense keeps saying this trial is about the shirt. No, it's about Danny. [¶] Where is Danny? Where is Danny? [¶] The defense has a subpoena power. They can call whoever they want. He's a long-time family friend. He's still a family friend. He lives in Altadena. It's, what, 10 miles away. He's been waiting for trial for five years. Danny is the ultimate alibi witness. [¶] Where is he? [¶] He's not here because it's a lie."

During deliberations, the jury sent a written note to the court asking: "Why was Dan[n]y Pacheco not subpoena[ed] to testify[?] [¶] Why was not [*sic*] Mr. Ibarra father in law not subpoena[ed] to testify[?]" The court, "after confirmation with Counsel," responded: "The court cannot answer those questions." Ten minutes later, the jury reached a verdict.

### B.     Applicable legal principles and standard of review

"A trial court is required to ' "instruct[ ] the jury on all the general principles of law raised by the evidence which are necessary for the jury's proper understanding of the case." ' [Citation.] A court also has 'a general obligation to "clear up any instructional confusion expressed by the jury." ' [Citation.] This obligation arises under section 1138, which provides that if deliberating jurors 'desire to be informed on any point of law arising in the case, . . . the information required must be given' to them in court.

"Thus, ' "[w]hen a jury asks a question after retiring for deliberation, '. . . [s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law.' [Citation.] But '[t]his does not mean the court must always elaborate on the standard instructions.' " ' [Citation.] Rather, if

26

' "the original instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information." ' [Citation.] On the other hand, 'it is generally not acceptable for a trial court to "merely repeat for a jury the text of an instruction it has already indicated it doesn't understand," ' and 'the court "must at least *consider* how it can best aid the jury." ' [Citation.]" (*People v. Doane* (2021) 66 Cal.App.5th 965, 980.) We review the trial court's decision not to provide further instructions for an abuse of discretion. (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4.)

## C. Discussion

The jury instructions made clear that the People bore the burden of proof, and Ibarra did not. Both before and after the presentation of evidence, the court instructed that Ibarra was presumed innocent, the People were required to prove him guilty beyond a reasonable doubt, and that Ibarra was not required to present evidence to prove his innocence. The court also instructed that neither the prosecution nor the defense was "required to call all witnesses who may have information about the case or to produce all physical evidence that might be relevant." The court reiterated in a separate instruction that the jury "may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt. [¶] If the defendant failed in his testimony to explain or deny evidence against him[,] and if he could reasonably be expected to have done so based upon what he knew, you may consider his failure to explain or deny in evaluating that evidence. *Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt.* [¶] If the defendant failed to

27

explain or deny, it is up to you to decide the meaning and importance of that failure." (Italics added.)

The jury's question did not demonstrate that the jury misunderstood the instructions about the burden of proof. The question asked only why certain witnesses were not subpoenaed, not specifically why the defense did not subpoena the witnesses. Nor did the jury's question ask the court whether or how the absence of these witnesses should affect their assessment of Ibarra's guilt.

*People v. Loza* (2012) 207 Cal.App.4th 332 (*Loza*) provides a useful contrast. There, the court instructed the jury that a person was guilty of a crime as an aider and abettor if, among other things, the person knew of the perpetrator's unlawful purpose and specifically intended to aid the commission of the crime. (*Id*. at p. 349.) During deliberations, the jury sent a note asking whether " 'the state of mind of the aider and abettor need/should be considered' " or whether an aider and abettor " 'worried about an attack from the perp[e]trator' " affected " 'the degrees of murder.' " (*Ibid*.) The court responded that the jury " ' "must apply the evidence to the law as [it had] been instructed." ' " (*Ibid*.) On appeal, the court found defense counsel rendered ineffective assistance by failing to object to the trial court's response. (*Id*. at p. 350.) The court found that "[b]y asking whether it was required to or should consider the state of mind of the aider and abettor, the jury clearly indicated that it had not understood, from the instructions that the court had already provided, that it had to determine [the defendant's] intent as to each offense she was accused of aiding and abetting." (*Id*. at p. 355.) Under these circumstances, the court concluded

28

section 1138 required more than advising the jury to "rely on the very instructions that had confused them." (*Loza*, at p. 355.)

Here, the jury did not pose a question to the court about a legal principle that an instruction had already addressed. It did not ask the court whether or how the absence of the two witnesses affected the burden of proof or its assessment of Ibarra's guilt. Nothing indicated that "the instructions that the court had already given had left the jurors confused," triggering the court's obligation " 'to clear up any instructional confusion expressed by the jury.' [Citation.]" (*Loza*, *supra*, 207 Cal.App.4th at p. 355.) In the absence of any indication that confusion about the burden of proof motivated the jury's question, we presume the jurors understood and followed jury instructions that made clear that Ibarra did not have the burden to present evidence explaining or denying the evidence against him. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions."].)

Ibarra contends that, considering the People had "implicitly urged the jury to disbelieve appellant's defense . . . based on his failure to prove otherwise," the instruction under CALCRIM No. 361 requiring the jury to determine the significance of Ibarra's failure to explain or deny evidence led to confusion about the burden of proof.

We disagree that CALCRIM No. 361 or the prosecutor's arguments allow us to presume jury confusion. The jury's factual question about why certain witnesses were not called to testify does not suggest it misconstrued CALCRIM No. 361, which "rests on the logical inference that if a person charged with a crime is given the opportunity to explain or deny evidence against him or

29

her but fails to do so, then that evidence may be entitled to added weight." (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 605.) Further, it is well established that a prosecutor " 'may allude to the defense's failure to present exculpatory evidence' [citation], and such commentary does not . . . erroneously imply that the defendant bears a burden of proof." (*People v. Lewis* (2004) 117 Cal.App.4th 246, 257.) When a defendant testifies in his defense and "offer[s] an alibi defense in which he identifies other persons who could support his testimony, and those witnesses are available and subject to subpoena," a prosecutor's "comment on a defendant's failure to call witnesses" is "appropriate and permissible." (*People v. Ford* (1988) 45 Cal.3d 431, 447; *People v. Nadey* (2024) 16 Cal.5th 102, 157.)

The jury's understandable curiosity about why individuals referred to in the trial testimony were not called as witnesses indicates it permissibly considered the absence of logical witnesses, not that it was confused about the burden of proof. The trial court did not abuse its discretion by informing the jury it could not answer the questions posed.

## III.  Failure to Instruct on Lesser Included Offense

Ibarra also contends the trial court erred by failing to sua sponte instruct the jury on felony false imprisonment as a lesser included offense of aggravated kidnapping. We find no error.

### A.  Applicable legal principles and standard of review

Section 209 codifies the crime of aggravated kidnapping for several enumerated sexual offenses, including sexual penetration by force. (*Id*., subd. (b)(1); *People v. Robertson* (2012) 208 Cal.App.4th 965, 978.) Aggravated kidnapping occurs if, in the course of committing the crime, "the movement of the victim is

30

beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2).)

"False imprisonment is a lesser included offense of aggravated kidnapping." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 380.) Felony false imprisonment occurs when a defendant restrains another person's liberty through "violence, menace, fraud, or deceit." (§§ 237, 236; *People v. Wagstaff* (2025) 111 Cal.App.5th 1207, 1232–1233.) "[K]idnapping, be it simple or aggravated, requires a degree of asportation not found in the definition of false imprisonment. Indeed, false imprisonment can occur with *any* movement or *no* movement at all." (*People v. Reed* (2000) 78 Cal.App.4th 274, 284, fn. omitted.)

"A trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense. [Citation.] Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. [Citations.] Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*People v. Simon* (2016) 1 Cal.5th 98, 132.) We review de novo the trial court's failure to instruct on a lesser included offense. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

B. **There was no substantial evidence from which the jury could conclude Ibarra committed false imprisonment and not aggravated kidnapping**

Ibarra asserts that the record supported an instruction on false imprisonment because the jury could have reasonably

31

doubted whether the underlying crime involved the requisite degree of asportation. We disagree.

The evidence was undisputed that Ibarra advanced toward Jeanette in the narrow walkway behind her house, backing her into the threshold of the laundry room before using the tank top to drag her inside, where he assaulted her. This evidence does not permit the conclusion that the distance Ibarra forced Jeanette to move was merely incidental to the commission of sexual penetration by force, or that it did not increase the risk of harm already inherent in the offense.

Ibarra contends that Jeanette's testimony left unresolved "whether she was so close to the doorway that she was not actually moved a substantial distance." Yet, the "[m]easured distance" a victim is forcibly moved "is a relevant factor, but one that must be considered in context, including the nature of the crime and its environment." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 (*Dominguez*).) "[T]here is no minimum number of feet a defendant must move a victim" to establish that the distance was not merely incidental to the underlying offense. (*People v. Rayford* (1994) 9 Cal.4th 1, 12.) Additionally, "[w]here movement changes the victim's environment, it does not have to be great in distance to be substantial." (*People v. Shadden* (2001) 93 Cal.App.4th 164, 169 (*Shadden*).)

Considering these principles, there is no evidence from which the jury could have concluded that Jeanette's forced movement was merely incidental. Ibarra's "forcible movement" of Jeanette was not limited to his use of the tank top to drag her over the threshold of the laundry room. The asportation element of kidnapping can be carried out through force *or* fear. (*People v. Lewis* (2023) 14 Cal.5th 876, 890; CALCRIM No. 1203.)

Jeanette's testimony established that Ibarra was at the other end of the walkway when he began advancing toward her. His approach cut off other escape routes and forced her backward toward the laundry room. Although the record does not disclose the actual distance involved, the evidence indicates that it was at least the length of her car. This undisputed evidence reflected that Ibarra forcibly moved Jeanette over a substantial distance. (See, e.g., *People v. Waqa* (2023) 92 Cal.App.5th 565, 583 [eight to ten feet between bathroom stalls sufficient for substantial distance]; *Shadden*, *supra*, 93 Cal.App.4th at p. 167 [victim dragged nine feet within video store was moved substantial distance].) Additionally, Jeanette testified that she was forcibly moved from an outdoor area in her complex to inside the laundry room. Her movement "from an open area to a closed room" constituted a change to the environment that rendered the distance substantial. (See *Shadden*, at p. 169 [victim dragged from front of video store to back room for attempted rape moved substantial distance].) No other evidence supported a contrary inference.

We likewise reject Ibarra's argument that substantial evidence supported the inference that moving Jeanette into the laundry room did not increase the risk of harm because there was no evidence that the door was closed or locked. The laundry room was in the back corner of the property. The north, south, and back of the property were enclosed by either a wire fence or brick walls. By forcing Jeanette to move from a narrow, outdoor walkway that was accessible to and visible from the carport into a room concealed from outside view, Ibarra "changed [Jeanette's] environment from a relatively open area . . . to a place significantly more secluded, substantially decreasing the

33

possibility of detection, escape or rescue." (*Dominguez, supra,* 39 Cal.4th at p. 1153.) Being inside the laundry room, irrespective of whether the door was closed or locked, helped conceal Ibarra's crime from view and appreciably decreased the likelihood of detection. Further, the movement into the laundry room impeded any chance Jeanette otherwise may have had to escape or call for help.

For this reason, Ibarra's reliance on *People v. Perkins* (2016) 5 Cal.App.5th 454, is misplaced. The court in *Perkins* found that the victim's forced movement between two rooms in a private residence did not increase the risk of harm because no evidence showed the doors to either room were closed while the defendant raped her. (*Id.* at p. 470.) Here, Jeanette's forced movement did not occur within a private dwelling. She was moved from an outdoor area into an enclosed structure. *Perkins,* therefore, does not suggest that because the laundry room's door was open or unlocked, there was substantial evidence from which a jury could have concluded Jeanette's movement did not increase the inherent risk of harm.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ADAMS, J.

We concur:


EDMON, P. J.



EGERTON, J.